In the last case this morning is Klaustek v. Kugel, 2019-15-36, Ms. Klaustek. Thank you very much. May it please the court. The district court committed two reversible errors with regard to two separate, although related, claim limitations. The first is the browser limitation of the 651 patent, and the second is the browser identity limitation. Now with regard to the browser limitation, the court clearly erred in concluding that Klaustek had failed to disclose in its infringement contentions any theory for the browser. Now that conclusion was clear error because, in fact, the infringement contentions disclosed that the browser was the operating system operating on the mobile device. That disclosure is contained in both the claim charts discussing the preamble to Claim 20 and Claim 25, the independent claims asserted here. Where do you think is your best place, where would you identify an appendix that we should look to for your best place where you think that it's identified? The two places would be the preamble section, which is Appendix 4454, and then the discussion of Element A, which appears at 4464. And I'm identifying those pages of the appendix as they relate to the claim chart for Android. The claim charts for the iOS Apple systems include the same language, but instead of Google's proprietary operating system, it points to iOS, which is, of course, Apple's proprietary operating system on the mobile device. So backing up, Claim Element A requires that there be a website for transmitting a page to a browser. And there's no dispute here that Klaustek disclosed that the website was the Google Play Store, that the page was the app. And so then the question is whether or not Klaustek sufficiently disclosed that the app was transferred to the browser, and it did. In the preamble section of the claim chart, it specifically discloses that the app is run on Android. It doesn't use the word operating system, but Android is Google's operating system on the mobile device. Likewise, in the claim chart discussing Element A, so the second citation at appendix 4464, Klaustek disclosed that the app is downloaded from the Google Play Store on Android. Now that reference to downloading is the suggestion that it's transferred from one system, the Google Play Store, to another system, Android, the operating system. It says the Google Play Store is on Android. That's right, Your Honor. So how is that the browser? That is not the browser. It is the suggestion that the Google Play Store is operating within the Android environment so that it's transferred an app that can only go likewise to the Android environment. And to the extent that there was any ambiguity in what then would be the browser, that's the preamble, which also includes a reference to the browser or a description of the browser, and it's in that section that Klaustek further identified that the app, the page that is transferred to the browser, the app is transferred to Android. And it's on that basis that Klaustek contends that the district court clearly erred in concluding that the infringement contentions here didn't reference the operating system as the browser or in fact include any theory of what the browser is. That is the sole basis upon which the district court struck Klaustek's expert report opinions regarding the browser as the operating system, and as a result, Klaustek contends that that was reversible error that needs to be fixed. Unless your honors have any further questions on the browser limitation, I was going to jump now to the browser identity limitation. With regard to the browser identity limitation... You mean the unique identity? I do not. The browser identity limitation was incorrectly construed to be limited to a unique identifier for the browser. Now, the plain and ordering meeting of identity doesn't indicate any inherent requirement that it be unique. It simply means that you are referencing who or what a person, a thing, or a group of people or things are. Nothing about the word identity in and of itself requires that it identify one particular person and only one particular person, or one particular, in this case, instantiation of a browser and no others. Is there anything in the spec that suggests that identity could be something more than identifying a particular browser? Yes, your honor. A group of browsers, you know, or is the spec pretty consistent that when it says identity it's really talking about like a unique fingerprint for a particular browser? The specification, in fact, supports the claim that identity is not limited to a unique browser. And it does so in two ways. The first is that although it references in some places, not exclusively, but in some places a unique identifier, it does so when it's referring to an embodiment in which the central controller generates, transfers, and then interrogates for that unique identifier. Is that the top of column three? That is in column three, your honor. What about in the abstract? It talks about being able to provide ads to a particular browser. Wouldn't you have to have a unique identifier in order to emphasize a particular browser? I think particular on its own could likewise refer to a particular group of browsers rather than an independent, unique instantiation. But even if particular could be interpreted to mean unique, in that instance it's referring simply to one way in which this patent could be used. There's nothing in the patent that indicates the specification or the claims that indicates this invention is unique identifiers. Is there anything in the patent, and this goes back to Judge Chen's question actually, is there anything in the patent that suggests, you know, multiple different browsers where they get the same ad because the same identifier applies to them? There isn't explicit language that talks about the word non-unique identifiers. What there is is reference in the specification to identifiers and unique identifiers. And it's in Claim 7 where you can see that the specification portion referring to unique identifiers is ultimately claimed. So Claim 7 was canceled, but it depends from Claim 6. And Claim 6 has an element relating to interrogating for browser identity. In that sense, that portion of Claim 6 is identical to the independent asserted claims here, Claim 20 and 25. I take it Claim 6 was canceled as well. It was. So that portion of... Then Claim 7 limits Claim 6 by adding an additional step? It does. And the additional step that it adds is meaningful here. It adds the additional limitation that the browser... Generally transmitting and interrogating the unique browser identifier? No, it adds, in fact, the type of browser identifier is unique. And it's generated and transmitted by the central controller. And then it specifically recites that the whole purpose of having this type of identifier, this unique identifier, is so that you can uniquely identify the browser. That last fragment of Claim 7 discloses that the other identification, the other browser identity references in Claim 6 or in Claim 20 and 25 don't uniquely identify the browser. That happens in dependent Claim 7, which is different and adds a limitation that does not appear in Claim 6 or in Claim 20 or 25. Now, of course, there are references in the abstract and the summary of the invention to this claim, this invention of the unique identifier, and the fact that it can be used to specifically target ads to a particular browser. But there's nothing in the patent that disparages the use of non-unique identifiers. There's nothing that extols the use of unique over and above non-unique identifiers. There's nothing in the specification that says this patent requires unique identifiers, that it is essential to this patent that there be unique identifiers. And as a result, anything in the specification that is discussing the unique identifier does not need to be read into every claim of the patent. Claim 20 and 25 relate to the invention that uses non-unique identifiers, and claims like Claim 7 relate to the invention that uses unique identifiers. Is this an expired patent? It is not, Your Honor. It was filed in 1999. It is, Your Honor. I believe it is. I'm sorry. I'll need to double-check that there wasn't some kind of extension, but I think you are right. Unless Your Honors have any further questions on the claim construction, I was going to move to the second error with regard to browser identity. The second error that the Court committed with regard to the browser identity limitation is that it refused to allow Claustek to amend its infringement contentions to assert that the browser identity limitation was met by the advertising ID component of the AdMob system. And the reason that the denial of leave to amend was clear abuse of discretion is because in this case— How many times did the plaintiff amend the infringement contentions in this case? After serving its final infringement contentions, so after it had access to Google's source code, it did three amendments, or it made two amendments and then proposed a third, which is equivalent to what Google did. Google, in this case, also served three amended invalidity contentions. So it was a back-and-forth process of the parties continuing to narrow and crystallize based on the information that was being received as it was being received, including the Court's claim construction. In the third amended or proposed contentions, what Claustek sought to do was to accuse the advertising ID as being the browser identity. And the reason that the amendment should have been allowed is because Claustek, in fact, acted diligently. And the District Court's conclusion that Claustek lacked diligence was clearly erroneous. Here, the timing of Claustek's deposition of Google's engineer, or its 30B6 deponent, does not indicate a lack of diligence based on the unique facts here. Do I remember correctly that what the District Court relied on was the fact that there had been a 30B6 notice of deposition, and then the deposition wasn't actually taken until two years later, and that also the source code had been produced around that same time period, maybe two years earlier before the deposition? Do I have the facts right? It is correct that the deposition notice was served earlier in the litigation, but the actual deposition didn't occur until the end of the fact period, and that the District Court determined that the timing... The reduction of the source code. And that the source code was produced in the January to February time period of 2015. Counsel, you're well into your rebuttal time. You can continue or save it. I'm just going to make one more remark on this part. The unique facts that make this not a run-of-the-mill case where a plaintiff delayed in taking a deposition, and thus should be stuck and not allowed to amend its contentions, are that the produced code doesn't reveal that advertising ID is used in a way that implicates the patent. Google intentionally obscured its code so that it was undiscoverable that advertising ID was used, and Google repeatedly represented that it had produced all relevant information to show the operation of the system, and that the source code was the best evidence of the system. And it is based on those facts that Klaustek was reasonable in not knowing, or not having any reason to know, that the deposition was necessary to obtain critically missing information. Thank you, Counsel. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Hollwood-Vrimara. Thank you, Your Honor. May it please the Court. I'd like to address the issues in the same order that opposing counsel has, because- Could you start with the last one, actually? I'd be happy to. That's the one I'm interested in hearing more about. The notion that the code that they received early in the discovery was incomplete, and so therefore, and they were told that it was complete, and so they could not have known that there was missing code that was only revealed when they took that fairly late deposition. So, the code that was produced was complete. The district court considered this, and specifically found that Google had produced code that was responsive to the initial theory, and that had produced more code as Klaustek came forward and asked that they needed more to understand what they had initially received. The accusation here is against the client-side browser, and so in its initial production of code, that is what Google focused on, the AdMob SDK system and the code on the client side that reflects that operation. When Klaustek came forward and said that they needed more from the server side to understand what the servers did with that initially produced client-side code, Google came forward with that, and it produced all of the code, including how on the server side they would unpack the codes that were transferred over the internet. Now, of course, there are some of the parameters that are transferred over the internet, which is public, that are intentionally obscured so that people can't figure out and then be like what's going on on their own, and so some of that is obscured in what's public there, what's transferred across the internet. But on the server side, the code that was provided showed how to unpack that, including specifically with respect to advertising ID. Let's start with the fact that the district court emphasized that advertising ID and what it does within the Android environment was publicly disclosed, including the fact that it's a unique identifier that allows advertisers to track what users are doing. So that was publicly known. If you had searched for advertising ID within the server side code that was produced, you would find several references to it, including which of the obfuscated parameters that are transferred across the internet included the advertising ID. You would have been able to unpack that, and including in particular there is a spreadsheet that includes all of the parameters that are responsive to an advertising request, and that included that particular parameter that was associated in the code with advertising ID. So all of this was discernible from the code that was provided. If there had been any difficulty on the part of CloudStack in understanding that, they could have asked further questions. They could have done so through interrogatories. They could have done so through taking that deposition that was noticed in January of 2015, but they didn't do so until the very end of the fact discovery period. That is the definition, really, of lack of diligence. Remember that we're talking about enforcement by the district court of its own local patent rules, patent rules that were upheld by this court in the O2 Micro case. And O2 Micro made clear that it is the burden of the party seeking to amend late in the game to prove their diligence. It's not our job to prove absence of diligence. It's their job to prove diligence. And the court went through, in its opinion, all of these facts very carefully, and these are at pages 65 through 67, and rejected each of the arguments that were being made. The argument that Google stonewalled. The court specifically considered and rejected that. And the argument that they could, it was reasonable for them to delay taking the case. The court said it is routine in the Northern District of California to find an absence of diligence when the party fails to take key depositions until the end of the discovery period. This is a case that had been going on for seven years. Now, mind you, only two years of active litigation, but having noticed that deposition in January, having been provided the code in February and March of 2015, the interactive process providing more code as more is requested, and then the fact that once the deposition is taken, they immediately understand because the deponents say, well, this is what it is and this is where it is. They thought they had found a smoking gun because the first deponent said, well, there's a spreadsheet that shows these parameters. They said, get us that spreadsheet. We got them the spreadsheet. They said, this is the smoking gun. We said, that's the same spreadsheet that was produced in 2015. The version that was opposite in 2015, that's just an updated version. They have the same information. Both of them include that same disguised parameter that you would have understood from the server code included advertising ID. So the judge's determination, remember, 02micro says that enforcement of the local patent rules will be affirmed unless there is no evidence to support it. So there's ample evidence to support this. So if I could go back now to the first ground, which is the absence of any accusation identifying what in the accused system operates as the browser. Now, I think it's important to start here, and again, the district court did this as well, with the fact that their own expert admits that at the time of this invention, a traditional browser was something like Internet Explorer. A program that works on an underlying operating system. That browser going out and retrieving pages from websites. And that was what was the understanding at the time this invention took place. Now, it was not surprising to Google when, in their infringing contentions, and we'll go to specifically 4464, which is where they lay out the infringement contentions with respect to Claim 20 Element A. Claim 20 Element A has really three sub-components. Providing a website at a web server. Now that's, they accused that in the first sentence of their contentions. That's the mobile application store and the Android environment Google Play Store. We got that. And then the second sub-element is transmitting at least one page with a non-scrolling ad frame. And we've got that. That's in the second sentence of the contentions. The mobile app contains at least one page along with lines to install a non-scrolling banner ad frame in these pages. But then 20A has a third sub-element. That you're downloading that to a browser. Now, we, of course, knew that our system doesn't operate in that traditional way of a web browser. So it was not surprising to us that that is absent there. Now, they, now, later on, two years later, said, no, no. We meant that here. It's implicit somewhere that when it's transmitted, it's transmitted to the operating system. Now, there was always an operating system, even a traditional browser system. But that's not what the browser was in the invention. So that didn't tell us that they're saying in this instance, it's actually the operating system itself that is the browser. That was never informed to us. What about their reference to the preamble portion of this? Your Honor, I think that they're simply grasping the straws. Any reference to Android. Of course, there are references to Android throughout this because there were two sets of infringement contentions. One for the Android system and one for the iOS system. And so, you know, page one of Exhibit A says infringement contentions for AdMob Android. And it's in the headings of the infringement contentions against AdMob for Android. There are lots of references to Android because, as counsel indicated with respect to the contention on 4464. This language provides a downloadable software development kit, blah, blah, blah, within their apps which run on Android. That's not enough to say. That's not enough. Run on Android is true because the operating system that undergirds the whole environment is Android. We know that. No one's confused about that. The question is, what operates as that program in between the operating system and the page on which the page is being disclosed? Now, I'd really like to draw the court's attention to page 16 of the blue brief, which was where, in their opening brief, they tried to identify where it was that they had let Google know, put Google on notice of this accusation that it's the operating system that's acting as the browser, the accused browser. In the chart, there are four specified. And then underneath, there's C, also three additional. So a total of seven places where they said this was disclosed. Of those seven, five merely say that something is transferred to or displayed on the client device. Your Honors, this is the epitome of broadly, generally alleging infringement so that we can fill that empty vessel up later on when we've figured it out. And that's what the local patent rules in Northern District of California are designed to prevent. Anything, you could put anything into the client device. Is the operating system part of the client device? Yeah. But so is everything else, Your Honors. So we didn't know. And of course, we didn't expect that they would have something to identify because it doesn't operate the way that their really kind of old technology invention did with, you know, Internet Explorer operating on Windows. Of course, there are certain instances where that's still true today. Google Chrome operates on an Android system. Internet Sapphire works on an Apple iOS system. Those are browsers that work on those systems. But that's not what they've identified. They didn't identify anything. And in O2 Micro, the court made clear that if you can't present evidence, here they can't because it was properly struck by the judge when it was attempted to be in the expert report in support of infringement contention that was disclosed in the operative infringement contentions. And here there is none. This report specifically said there is no browser identified in the infringement contentions. Then they can't succeed on their case. That's when JMAL is appropriate. And that is indeed appropriate here, too. That would be an independent ground for affirmance. But the court can equally affirm on the alternative ground of the claim construction, which I'd like to reach right now. The claims refer, or not the claims, the specification refers throughout it to a unique browser identity. Now, you need the adjective unique to modify identifier because identifier does not in its own connote uniqueness. In the claims, they do something differently. They don't use unique browser identifier. They just simply say browser identity. The identity connotes uniqueness already. But we're not relying exclusively on the connotation of identity. It's the fact that these claims don't work without that notion. What they provide is, and this is as claimed in the abstract and in the document, is a tool that allows you to track what ad has already been seen by a browser so that you can send it another. And it does that through records. And those records are recorded from the browser with its browser identity, with the ad identity, and the time or timeout. Now, we know, and this is at column two on page 148 of the claim 20, the new claim 20, that each ad content having ad identity. So we know ad identity is unique for each ad. And we also know that each ad content having ad identity and an individual timer for timing out. So it also has an individual timer. So this record that's being reported to the central server, we know that it has individual ad identity, has individual timeout information, and it has browser identity. That file is then what it allows in the thing that makes this patentable when it went through re-exam and they added the last element of the claims. The last element of claim 20 is transmitting to the reporting browser an internet address for new ad content. So you, one, have to know which is the browser that has already reported this to me because I'm going to report it. I'm going to transmit something back to it. So you have to know which one has transferred this. And you have to know that this browser to which I'm transferring it hasn't yet had this ad because I'm transferring to it a new ad. All of that is in the claim language. And I haven't even got yet to the spec because unique browser identity, unique browser identifier is all over the spec. And I think, you know, I already pointed to the abstract because abstract is clearly relevant in understanding what the inventor thought they claimed. And they reference unique browser identifiers throughout as well as maintaining these records that are associated with the unique browser identifier indicating ads displayed and ads available for display and then dispatching to those browser identifiers the right ad content. And in the summary of invention, not only does it refer repeatedly including in column three where the district judge relied on to the unique browser identifier that is tracked by the unique, by the central system, but also to the fact that this enables this very highly tailored targeted advertising which you simply can't have if the world is divided into two browser identities. One for Android and one for iOS. It doesn't work. Thank you, Your Honors. Thank you, Your Honors. Taking up first the advertising ID amendment, the district court did not find that Google produced the code necessary to reveal how advertising ID actually operated within the AdMob system. That is that it was transferred within an advertisement request and ultimately recorded along with the ad content. It only found that it disclosed basic use and functionality of advertising ID, meaning that it disclosed it may be used in the AdMob system to uniquely identify, but not that it was used in the way implicated by the patent claims. And that's an important distinction because the code here, in fact, does not reveal that advertising ID is used in the way the patent claims. At most, it hints that it's used with regard to this proprietary confidential parameter that we're calling the security parameter. Just to make sure I understand the facts correctly, you discovered this, right, when the 30 v. 6 deposition occurred. That's when this was discovered. Is that right? The only evidence revealing that advertising ID is transmitted in an advertisement request and recorded with the ad content is the deposition testimony. There is nothing in the code that reveals that actually happens. And as a result, when Google represented that it had produced all of the code and that the only code it had produced indicated that at most, advertising ID was used by Google for purposes of monitoring or tracking security issues, and security has nothing to do with the patent, we had no reason to believe that advertising ID was used in the way the patent implicates. But a lot of this is going to hinge on our review of the district court's diligence finding, right? That's correct, Your Honor. Moving to the claim construction issue. I think we're moving to the end, counsel. Yes. The red light is on. Two very quick points, thank you, Your Honor. With regard to the claim construction issue, the purpose of targeted advertising isn't claimed in the claims themselves, and a number of other benefits or uses of the patent is described in the specification. There's no requirement that every claim meet every potential objective of the patent itself. And your second point? And my second point, Your Honor, is with regard to the browser identifier, the reason that we pointed to the client device portions of the claim charts was precisely Your Honor's question. That when we said Google Play Store on Android, and when we said that the page was transferred to Android, we weren't talking in that instance of the generic Android environment. We were talking about Android on the client device. Thank you, counsel. And that is the operating system. We have the case. The case is submitted. All rise. The honorable court is adjourned until tomorrow morning. It's in the clock, a.m.